Corporation and others, arguments not to exceed 15 minutes per time, and an early for good morning. Good morning, Your Honors. May it please the Court, I'm Joseph Daly for the lead plaintiff, City of Livonia, Employees Retirement System. I'm going to reserve three minutes for rebuttal. Your Honors, this morning I'd like to focus on the two overriding issues facing this Court. First, the strong inference of scienter arising as to Chief Executive Officer Kenny and Chief Financial Officer Robinson in connection with General Cable's admittedly false financial statements over several years. And second, the collective or corporate scienter imputed to General Cable itself through the actions and the state of mind of Executive Vice President Matthias Sandoval. Now, I would also like to note, before I get into those facts, that another panel of this Court in the Frank v. Dana decision a few years ago noted that these facts, these allegations, must be considered collectively, must be considered holistically, in line with the Supreme Court's teachings in the matrix decision and tell labs. Here are the facts that show Kenny and Robinson's scienter, at least raise a strong inference of that scienter. We know that coming into the acquisition of the Phelps Dodge International in 2007, just two years prior than that, prior to that, Mr. Kenny had to sign SEC filings telling investors that General Cable's internal controls were materially ineffective. We know that the two executives knew that General Cable and ROW systems were not integrated, thus giving executives at General Cable little access to ROW's underlying financial information. We know that the two men knew that General Cable's global controller and his financial group had sought additional financial information from ROW, and I'm paraphrasing here, but when the numbers came up from ROW, that's fine, gentlemen, but let us see some of the numbers behind those numbers. Where are you getting those numbers? And they were stonewalled at every turn. We know that the two men know that the ROW CEO, Sandoval's refusal to hand over the information was vehement. He threw, quote, a tantrum. He went, quote, ballistic. And what did they do? CEO Kenny instructed his people to back off. ROW's doing fine down there, leave them alone. We know that Mr. Robinson, as CFO, personally okayed every bill and hold transaction happening down in Brazil over the course of a certain year, of 2011, and those bill and hold transactions comprised fully 18% of the operating income of that ROW segment and comprised fully 12% of the net income for General Cable overall. Those bill and hold transactions are very important. The SEC looks at looks at them with great suspicion. You have to meet 12 specific criteria in order just to even be allowed to carry them on your books. And as we've alleged, and as General Cable later admitted, at least four of those criteria were not followed. So when Kenny told, made the statement to back off, ROW's doing fine, are you alleging that this was sort of willful blindness on their part, or they knew and just disregarded that? I prefer the term recklessness, and I'm not trying to be cute. No, no, that's fine. Willful disregard works fine, but because we're here in the securities fraud context, I prefer recklessness. And Judge Seiler, earlier in another argument, you mentioned you were talking about, well, was something negligent, or does it require absolute knowledge? Here, I think it's very important to note that in a 10b-5 fraud case, we don't have negligence. You're right, that doesn't get us there. Actual knowledge certainly gets us there, but of course, recklessness gets us there as well. Just going on through a few of the final facts, the magnitude of the accounting restatements. Now, the overstated net income and earnings per share are just staggering in this case. Over the course of three years, General Cable, because of these errors that took place underneath the 2009 through 2011, fully 51%, 23%, and 53%. The same three years, overstated earnings per share, which is a metric that investors the world over care very much about. How's your company doing? How are the earnings? Again, overstated, 50%, 23%, and 59%. And this court in the Conkle v. Debold case said, common sense and logic tell us that the greater the the more likely that it was made consciously or recklessly. Finally, I want to talk a little bit about the two gentlemen's incentive to act as they did. Both of these gentlemen had an overwhelming majority of their compensation tied to incentives. In just 2011 and 2012, both men, their compensation ranged from 80% to 85%. I'm sorry, their incentive compensation ranged from 80% to 85%. They had a huge amount of their annual revenue, their annual salaries and incentive compensation tied to how the company was doing, tied to earnings, et cetera, earnings per share. And as the court knows, we were able to submit some supplemental materials when we submitted the proposed amended complaint. And at that point, we were able to talk about how these two gentlemen also faced the specter of clawbacks from two directions. They could have that incentive compensation clawed back under either the federal government's Sarbanes-Oxley regulations or General Cable's own clawback regime, which was very draconian. It could go back three years and take three years of their incentive compensation. Now, turning to Mr. Matthias Sandoval, his scienter can be imputed to General Cable. He was an executive vice president of General Cable. He was also the CEO of ROW and Phelps Dodge down in South America. But more importantly, he was an executive vice president of General Cable. And this court in Omnicare said that we can allow the scienter of an individual at a corporation to be imputed to that corporation under three circumstances, and two of them are relevant here. To the corporation or the individuals? No, to the corporation. I'm not trying to get at Mr. Kenney and Mr. Robinson through Mr. Sandoval. I'm using Mr. Sandoval's scienter to get General Cable itself. First, any agent of the corporation who, among other things, furnished information for the statement in which the misrepresentation appeared. Well, that was Mr. Sandoval's job. He gathered the information from his subordinates down in South America. He sent those numbers up, and I say up, he was actually stationed in Miami. But he sent those numbers up to General Cable to be folded into their overall financial statements. He sent his subordinates certifications, their Sarbanes-Oxley certifications, as well as his own, up to General Cable. And as we know now in retrospect, those were all false. The second way that this court said in Omnicare that you can get the scienter of an individual imputed to the corporation, is if any high level executive or board member recklessly disregarded or tolerated the misrepresentation after its issuance. Well, we know here that Mr. Sandoval knew, quote, and this is General Cable's own words, not mine. No later than January of 2012, knew what was happening down in Brazil. Knew about the inventory discrepancies that couldn't be reconciled. Knew about the thefts from the Brazilian facility, and yet he sat on that information for nine more months, until September 2012. Now, I know General Cable... He's part of a fraud, or is he just incompetent so that he didn't know what was going on? I don't know if there's anything in the record that shows he's part of the fraud, but I disagree completely that he was merely incompetent. He was reckless. In fact, he's, this individual, more than anybody else involved in this case, I think the needle certainly pushes right up against actual knowledge. He was told in a phone call, pardon me, in a conference call in January 2012, this is what's going on. We have a confidential witness, CW3, who was on that conference call with him. And this is no run-of-the-mill confidential witness. This is no gentleman down on the loading dock. This is not a person working in the back office. This is a person that was the senior vice president of Latin America for ROW. And even though he didn't disclose that to GC, you're saying that because he was such a high-level person, he knew that can be imputed to GC. So it doesn't make any difference that he just sat on that and didn't do anything. Exactly. And that would be prong number three of the Omnicare test. Now, and it's important to note that, as I said, General Cable itself, after the fact describing what Sandoval did, said that ROW executive management overrode the controls, so inventory accounting issues were not timely reported. That he, quote, discouraged Brazilian personnel from disclosing the matters in their own certifications. And most seriously, ROW executive management did not report these accounting executive, pardon me, these accounting inventory issues to General Cable, even though he was, quote, aware of the issues no later than January 2012, and we know what happened afterwards. General Cable, afterwards, looked at Mr. Sandoval and said, you know what? We're going to exercise that clawback provision that we put into place in 2012, and we're going to take back your incentive compensation for 2011. His incentive compensation that year was $1 million out of an overall salary of $1.5 million. So they clawed back two-thirds of his incentive compensation. And I want to use that just to circle back briefly to what was going through, perhaps, Mr. Robinson's and Mr. Kenney's heads at the time were allowed to make this inference. He had 66% of his incentive compensation taken, clawed back. They were looking at perhaps having 80% of their annual, I don't want to use the word salary because salary, I think, is separate from incentive, but they had 80% of their annual compensation at risk for those years. And so that, I believe, is a strong indicia of scienter for those two gentlemen. And I think Sandoval, the scienter with this gentleman, the facts show not just recklessness but actual knowledge, which we don't need, but we're happy to take it. I do have a minute left. I can either reserve it or I can take some questions. I reserve it, counsel. Thank you. Good morning, and may it please the court. I'm Mark Sonnenfeld. I represent the Appellees and Defendants General Cable Corporation, a global company headquartered in Highland Heights, Kentucky, and Defendants Gregory Kenney and Brian Robinson, who were at the time its CEO and CFO. This is an action for alleged securities fraud under Section 10B of the Securities Exchange Act of 1934 and SEC Rule 10B-5. Arising out of General Cable's 2012 and 2013 announcements of restatements arising out of accounting errors occurring primarily in its Brazilian subsidiary, which it had acquired from Phelps Dodge Corporation in 2007, and which was headquartered in Miami, Florida. And since Mr. Sandoval was a high-ranking official at ROW and knew certain things about the internal controls, why shouldn't Mr. Sandoval's knowledge, actions, and lack thereof be imputed to General Cable? Why shouldn't that satisfy the scienter? Because, Your Honor, what we have to do, and I'm glad you asked that question, because that is one of the key issues in this case, is the issue of corporate scienter. It's the issue that arises when an officer of a company, not the maker of the alleged false statement, that is not Kenny or Robinson, as in this situation, but someone else, allegedly has knowledge. Can that be imputed to the corporation to establish scienter to the corporation? And this Court has addressed that very issue in three cases recently. First, in the Bridgestone case, decision by Judge Oberdorfer, sitting here by designation, in 2014 in the ComShare, in the Omnicare case, and then within the past year in the case of, the case arising out of the Kentucky Fried Chicken Company. In. The Yum case? Yeah, Yum, I think of Kentucky Fried Chicken, the Yum case. The analysis really revolves around the framework set up in the Omnicare case. And in the Omnicare case, the Court really did two things that are important. One is that identified three categories of people whose knowledge can be imputed to the company, and then the other, which is very important, is the Court set up a two-step analysis in Omnicare. You first can look at the state of mind of people who furnished information that was used. We'll know what they say, but tell us how that, talk about your case. Okay, and what they're saying, what the argument here is, is that Sandoval furnished information, although he was not a maker of the false statements, that he furnished information knowing that it was wrong. That's the argument. We say, and I think the analysis that Judge Bertelsman followed below, which is consistent with what this Court did in Omnicare, is to apply the nine Hellwig factors of the Hellwig decision of this Court, and to apply them at two levels. First, as to Sandoval, to say despite whatever knowledge is allegedly attributed to him, despite that, has the complaint pled Sienner as to Sandoval? And secondly, as to General Cable as a whole, despite what is attributed to Sandoval, looking at the nine Hellwig factors, is there Sienner as to, pardon me, is it pled? Yes, that's right, is it pled? It needs to be pled with particularity. And it needs to be exactly right, Your Honor. It needs to be pled with particularity under the PSLRA, which in Omnicare, this Court said is a elephant-sized boulder to the plaintiffs. And in Omnicare, the panel was very concerned as well about creating strike suits, and that's the word that was used by the panel, where the state of mind of someone not making the statement somewhere else in the company is attributed to the company. And Judge Bertelsman went through the nine Hellwig factors and found that none of them supported an inference of Sienner as to the company. And before you go further into that, is it your allegation here that the Sienner, the corporate Sienner was not pled with particularity in the complaint in this case, or are you just going through the Hellwig factors? No, our argument is that it was not pled with the particularity at either level, that it was not pled with particularity either as to Mr. Sandoval, or even assuming that they established Sienner as to, not establish it, but establish the pleading of a strong inference of Sienner as to Sandoval, then they have not established that there was an intent to defraud on the part of the company looking at the nine Hellwig factors, and all of those. Does the magnitude of the errors not get the plaintiff a long way down the pike? The magnitude alone does not get them down the pike, Your Honor. It's strong though here. It is not as strong as the plaintiffs would have us believe. The issue arose in the cost of sales line. The cost of sales line was a line that is less than, you know, it's a very small percentage off. It's only when you start to roll down and get to the revenue that it gets to a higher number. So there would have been nothing to alerted. And we'll just talk about the magnitude and the number of errors. Yes. We know the plaintiff has a tough uphill battle to get the information they need to plead with particularity, but I don't know. It strikes me that we start, they've offered a good bit here in just saying we know this, but I want to ask them more about the timing. They're not able to give us timing on a lot of this. It's sort of broad brush in who said what, when, and the tantrum, and when, and to whom, those sort of things. I agree with that, Your Honor. And I would say the plaintiffs do have a lot here because General Cable is a public company. There is a lot in the public domain, and that's quoted in the complaint. They've quoted from the 10-Ks, they've quoted from the amendments to the 10-Ks when the company announced its restatements, and the company has been very transparent about the process that's going on. The plaintiffs also in the complaint quote from six so-called confidential witnesses. I would submit that there is an extrapolation between what is attributed to the confidential witnesses in the complaint and the arguments that are made in the briefs, there really are three key paragraphs in the original complaint for the court to keep in mind, and they're paragraphs 101, 125, and 126, where the plaintiffs make their confidential witness allegations. And I would submit that in those paragraphs, in response to Judge Cook's questions, there isn't a particularity, there isn't a particularity that would survive the significant elephant-sized hurdle of the PSLRA. We don't get the context, we don't get what was allegedly held back, and I think the plaintiffs take liberties with their argument and how they characterize what they attribute in paragraphs 125 and 126 to CW1, as they call them. You also have to look, and the court is instructed under TELABS to weigh competing inferences. This is an inherently comparative process, and certainly that's what the court did in Dana versus Frank, looking at the complaint holistically. TELABS mandates a weighing of competing inferences. Here you have the General Cable, based in Highland Heights, has acquired a public company, Phelps Dodge, headquartered in Florida, that has run successfully for many years. It had its own, as the complaint acknowledges in paragraph 101, it had its own Sarbanes-Oxley consultant working for it. It was a successful operation. There's every reason to believe it would continue to be successful and well-run, and certainly it's not an unreasonable inference to draw that if you have a successful operation, you don't want to interfere with it. And the failure to have integrated an acquired public company fully into the new parent company does not support an inference of recklessness, as has been suggested by the plaintiffs. There is a competing, and as Judge Burleson found, a more compelling inference that this is a successful operation and there wasn't the need to look further. So, and Sandoval had been the one running it all those years. So, and to address some of the other, oh, and in the amended complaint, in the proposed amended complaint in paragraph 77 of the proposed amended complaint, the plaintiffs tried to add an allegation that CW3 had participated in a phone call with Sandoval and others in January of 2012. But again, there isn't, as Judge Donald suggested, there isn't a particularity there of what was discussed, what was the extent of the problem, what did, you know, what did Sandoval know? And I think that when my friend says the company admitted Sandoval knew in January, that really isn't what was in the public filing. It was the management, the row management knew something about inventory discrepancies in January of 2012. Sandoval's knowledge was not what was addressed in the public filing, nor in the original complaint. And indeed, in the original complaint, Sandoval was only mentioned once. And as Judge Bertelsman noticed that, noted that the argument on the motion that was dismissed last January wasn't pressed to say what pointed to Mr. Sandoval's center. Plaintiff's counsel was hard pressed to respond. Those were Judge Bertelsman's words. But in paragraph 77 of the amended complaint, there is now this allegation attributed to CW3 that Sandoval was on a phone call in January of 2012 when the inventory shortages were discussed. Again, no context, nothing about the magnitude. And there are certainly competing inferences that all can be drawn from that. And... What's the competing inference to be drawn from the financial benefit to these individuals, the incentive issues? That is a red herring for at least two reasons. The compensation that they're referring to, that Mr. Kenney and Mr. Robinson allegedly received, was in the form of stock. So that if you artificially inflate the stock price, then the exercise price is higher. There's no benefit to them. And what is very significant here, and Judge Bertelsman noted this in his complaint, and it's one of the nine hell of a factors, there are no allegations of insider trading. So either by... The incentive were stock only. That's right. Yes, the incentives were stock holding, keeping up the... Stock only. Stock only. Yes. Not compensation. Right, right. So keeping up the market price of the stock, it's illogical. It has no benefit for them. And we made that point in our brief. And as far as the clawback, the company's clawback policy didn't go into effect until... It wasn't adopted until the end of 2011. That's pled in the complaint. And didn't go into effect until the beginning of 2012. So that really wasn't even an issue up to that point. So there was no economic incentive. And other... As far as general compensation, I mean, that would be an incentive that would apply to every executive of every public company. So that would almost dictate finding an inference of Sianer in any situation where there's been a restatement, which certainly is not the law. Well, counsel encourages us, of course, to, as I said before, to attribute Sianer. They encourage us to find a strong inference of recklessness based on a number of things. First, they say that Kenny and Robinson's failure to impose adequate controls on ROW is one. The improper bill and wholesales in Brazil. The GC's false certifications of effectively running internal controls, which they say was not true. The SOX certifications. The gap violations. And Sandoval's knowing in a reckless state of mind. Why... If the record supports those things, how can we not... Isn't that a basis for a strong inference of recklessness? Again, no. I submit no, Your Honor. It's not. And then I direct you, first of all, back to paragraphs 125 and 126 of the original complaint. And I think a lot of these are arguments that extrapolate beyond what CW1 says there. It is not that there was an absence of controls. It was simply that there wasn't an integration of this recently acquired public company into the overall thing. And there were expenses and costs for doing that. And there are reasons not to, as Judge Bertelsman noted. So that... And the mere fact of SOX, the certifications, there are a host of cases of this court that have said those are not enough alone. PR Diamonds is one good case on that. Another good decision that I think addresses that is Ricker v. Zoo, where these things really have to be in your face. The plaintiffs point to these as so-called red flags, but these have to be in-your-face type allegations, not ones that merely would give rise to an inference of negligence, which is not adequate as a route to see enter, but don't establish recklessness. And here there was a SOX compliance officer in the subsidiary. There were ordered financials. There's no doubt about that. It's a public company with ordered financials. And you have Kenny and the CEO and Robinson, the CFO, here in Highland Heights. And these are 2,000 miles away. So that, and I think if we look through the cases, we'll see that merely, these are not red flags unless they're really in your face, and the Ricker case discusses that, PR Diamonds among others. Thank you. So. Anything further? My time is up. I could keep talking, but I think my time is up. Thank you, Your Honor. Three and a half quick points, Your Honors, and I promise one of the three and a half is Judge Cook's question about the timing. I'll save that for last. The half point, my friend talked about there being a SOX director of compliance down there. Well, guess what? Our CW number one, our witness number one, was the SOX director of compliance for all of General Cable. So I think he knows what he's talking about when he says that these two gentlemen acted recklessly and shirked their duties in reining in ROW. The second point, my opponent says, has the complaint pleaded knowledge as to Sandoval? They admitted it. They admitted Sandoval's knowledge. They admitted it in a 10K amendment, and they admitted it again in a proxy when they sucked back 66% of his incentive compensation for the year 2011. Third point, the district court let Sandoval's compensation, his incentive compensation, 1 million of his 1.5 million that he was paid that year, they announced that they were going to take it back from him. Whether or not they were successful in doing that, I don't know. But they announced it in a public finding for their shareholders. The point about the district court letting Sandoval go, the district court let Sandoval's seantor go based on two false and erroneous premises. Number one, the district court said, well, I don't think Mr. Sandoval intended to defraud. We don't care. He doesn't have to have been shown to have intended. Mere recklessness is enough. And as I said, they themselves concede his recklessness with their party admission and their SEC filings. And the second point the district court said is, well, but you know what? General Cable came in afterwards and they punished him. So therefore, there's no seantor for General Cable. There is nowhere, this court will search the Omnicare opinion high and low, and you will find nothing in there, nor will you find anything in City of Monroe versus Bridgestone in which the court says that when we talk about corporate seantor, the corporation gets a pass as long as they quickly pivot and punish the wrongdoer whose seantor is being imputed to the corporation. Now, as to the timing, yes, I sure wish that CW3 said I was sitting in a coffee shop in Little Havana on a conference call on this date in January 2012, and I heard this. The allegations are what they are, but the allegations, although some of them may not be as granular as we would have liked, they have to be taken as true. And I believe that this court is allowed to draw some very logical inferences from the fact that we knew coming after 2007, we know that ROW and General Cable's systems are not integrated. Neither their financial systems, nor their IT systems, nor even their email systems, all right? Completely separate. You would expect that Mr. Kenny and Mr. Robinson would look with more scrutiny upon that division down there in South America. But instead, and we are told by the CWs, unfortunately, without a date, without a specific date, that there were conversations that were held where people were told what was going on in Brazil. The fact that- We don't know the date, do we don't know the people? We do know the people. The complaint alleges that the people on that teleconference were the Brazilian controller. There was a woman, and I'm sorry, her name escapes me. You don't have to recite her name for me, but- Yes, Mr. Sandoval. You have the names and- And the positions. And their positions. Yes, and we all, I'm sorry. And the content of the conversation. We have the general content, yes. Thefts in Brazil and inventory issues, and what we have, what corroborates all that? What brings all this big ball of wax together? The fact that later on that year, 2012, October 2012, General Cable has to announce to its shareholders, to the world, guess what? You can't rely on 22 of our last quarterly and annual periods. You can't rely on those numbers. And that we are going to have to restate at least three years of those. That is strong corroboration for what we've just alleged. And the, I mean, I pressed counsel, so I know I'm missing something. But the incentive was, counsel, I thought, and I probably asked the question wrongly. But I thought that I was told the only benefit to these insiders for what they were doing was stock. And therefore, we could kind of write that off. That they weren't personally profiting because the stock is the stock. Well, that's what he says. But just because, and I've never been granted a stock option in my life, but I do know this about them. When you're granted stock options as compensation, they can be granted at all sorts of different strike prices, if you will. And I'm aware of any, I'm aware of anything. There wasn't cash incentives to, I mean, dollars. It was all stock. That's still true. I'm not. And you say there's still a big benefit to it. I get that. Of course. I mean, Larry Ellison cashed in $900 million of his stock in the Oracle case, so. Small change to him. Yes. We should all be so fortunate. Thank you, Your Honor. Counsel, thanks for the argument, and we will look at your case carefully. You will receive an opinion.